IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| JULIE D. GLOBUS, CUSTODIAN FOR TAL M. GLOBUS,<br>　　　　　　　Plaintiff,<br><br>v.<br><br>ARTHUR W. COVIELLO, CHARLES R. STUCKEY, JR., JOHN ADAMS, JOHN F. KENNEDY, SCOTT T. SCHNELL, JOSEPH UNIEJEWSKI, GLORIA C. LARSON, JOSEPH B. LASSITER III, RICHARD A. DEMILLO, RICHARD L. EARNEST, WILLIAM H. HARRIS, JR., ORSON G. SWINDLE III, ROBERT P. BADAVAS, JAMES K. SIMS, TAHER ELGAMAL,<br>　　　　　　　Defendants,<br><br>and<br><br>RSA SECURITY INC.,<br>　　　　　　　Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.: 06-00367-SLR<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF MICHAEL R. DUBE IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

Michael R. Dube, being duly sworn, deposes and says:

1.　　My name is Michael R. Dube. I am an attorney with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, MA 02109.

2.　　I am counsel for all Defendants in the above-captioned matter.

3.　　I submit this affidavit in support of Defendants' Motion to Dismiss Under Rules 12(b)(6), 23.1, and 8(a)(2) of the Federal Rules of Civil Procedure.

4.　　Attached hereto as **Exhibit 1** is a true and correct copy of a May 16, 2006 report by the Center for Financial Research and Analysis ("CFRA") referred to in the Complaint in this action.

5.     Attached hereto as **Exhibit 2** is a true and correct copy of a newspaper article James Bandler, et al., *Criminal Probe of UnitedHealth's Options Begins*, WALL ST. J., May 18, 2006 at C1, that is referred to in the Complaint in this action.

6.     Attached hereto as **Exhibit 3** is a true and correct copy of a newspaper article, Steven Syre, *Timing is Everything*, BOSTON GLOBE, May 23, 2006, at E1, that is referred to in the Complaint in this action.

7.     Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the Third Restated Certificate of Incorporation of Security Dynamics Technologies, Inc. and Certificate of Change of Name.

8.     Attached hereto as **Exhibit 5** is a true and correct copy of *Taddy v. Singh*, No. 1:04cv1051, slip op. (E.D. Va. Dec. 8, 2004).

Michael R. Dube

Dated: July 17, 2006

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 17, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing, and hand delivered to the following:

> Pamela Tikellis, Esq.
> Chimicles & Tikellis LLP
> P.O. Box 1035
> One Rodney Square
> Wilmington, DE  19899

> Kelly E. Farnan (#4395)
> Farnan@rlf.com
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE  19899
> (302) 651-7700

# EXHIBIT 1



**AT A GLANCE**

"We encourage our clients to embed CFRA in their research and investment processes — not only as an idea generator, but also as a resource for risk management, due diligence and increased analytical capacity. Put simply, CFRA strives to be your go-to firm for forensic accounting research, helping you leverage your most valuable asset: time."

Richard Leggett
President & CEO

## Established Leader

Founded in 1994 by Dr. Howard Schilit, CFRA is the independent global leader in forensic accounting research and due-diligence services for the institutional investment, financial services, insurance, corporate, legal, and regulatory communities. CFRA is headquartered outside of Washington, DC with offices in Boston, Chicago, and London. We are backed by TA Associates.

## Industry Innovator

Through a rigorous and proprietary research process, CFRA's team of analysts — including dedicated pan-European and Asia teams — assesses the quality and sustainability of reported financial results at over 4,000 companies globally. CFRA is the first mover in this space — with a global clientele that includes some of the most prestigious institutional investors, insurance underwriters, regulatory bodies, and diversified financial services firms.

## Talented Team

CFRA's team of analysts is organized into five global industry sectors — including Consumer/Retail; Diversified Industrials; Financial Services; Healthcare; and Technology, Media, & Telecom. Our analysts average over ten years of experience in accounting, finance, and industry.

## Independent & Unbiased

As an independent research provider, CFRA is singularly focused on providing our clients with timely and impactful analysis, including early warning signs of business deterioration. Clients rely on our unique objective perspective - free from any conflicts associated with underwriting and trading activities — in our review of earnings and cash flow quality, corporate governance, and overall business health.

## High Touch Service Model

We pride ourselves on being far more than a publisher of research, working with each and every client to understand its investment strategy and research process — and to provide service offerings tailored to each client's unique needs. We encourage our clients to embed CFRA in their research and investment processes — as a resource for idea generation, risk management, due diligence, and increased analytical capacity. Put simply, CFRA strives to be your go-to firm for forensic accounting research, leveraging your most valuable asset: time.

## Breadth of Coverage

CFRA provides forensic accounting research on an extensive universe of companies in North America, Europe, and Asia. Vital to any sound investment strategy, our exception-based coverage model has identified nearly every significant accounting fraud — and has effectively and consistently forewarned our clients of operational deterioration, pre-announcements, restatements, and securities claims. Our early warnings span throughout the years — from Sunbeam to Microstrategy and, most recently, Delphi Corporation.

*For more information, please contact Garvis Toler, Director of Sales, +1.301.255.6625*

# CFRA Services

Rigorous Methodology. Unique Expertise. Invaluable Information.

## Core Services

**CFRA BIGGEST CONCERNS LIST.** We identify companies believed to have significantly poor quality of reported financial results, operational metrics and/or corporate governance in a quick-read, snapshot format. *This list is updated bi-weekly.*

**ACCOUNTING RESEARCH BLOGS.** CFRA's blog research blogs contain our analysts' raw notes, findings, observations and incremental insights from the most recent analysis of regulatory filings and company press releases. *The blogs are updated regularly.*

**IN-DEPTH COMPANY REPORTS.** Our in-depth company reports focus on quality of earnings, cash flow, other operational indicators, and corporate governance. We provide an executive summary and score-card for each piece of published research.

**RESEARCH BRIEFS.** These regular updates to our company reports provide "actionable" insights based on recent information - including an immediate response to significant events such as earnings statements or SEC investigations.

**CFRA'S CONFERENCE CALL SERIES.** Our conference calls cover a broad range of accounting, educational and industry-focused topics. In addition to providing a topical overview, these interactive calls provide our clients with company-specific implications. Transcripts and replays are available on the CFRA website.

**INDUSTRY ANALYSES.** This broad-based evaluation of key companies within an industry enables our clients to compare peer companies against various accounting benchmarks. We place special emphasis on areas of management discretion.

**EDUCATIONAL SERVICES.** Our thematic Education Reports and on-site, interactive roundtable sessions help clients understand emerging accounting issues across industries. Examples: IFRS Accounting for Stock-Option Compensation, Pension Accounting, Cash Flow Shenanigans, and Lessons Learned.

## Bespoke Services

- Premium service
  - Client-driven, proprietary research projects
  - Output and delivery tailored to client's needs
  - Project "bundles" priced as an add-on to core service
  - Scope: from summary diagnostic reviews to detailed reviews

## Industry Risk Assessment Profiles (IRAP)

IRAP's provide the latest and most relevant accounting issues for each of 62 industry sectors. Each IRAP points to: how and where to find these issues in a company's financial statements or disclosures; the potential impact to the quality and sustainability of reported results; and where applicable relevant company examples and precedent situations. CFRA's IRAP library is a continuous learning tool, updated annually with new issues and examples.

## CFRA's Criterion Model

CFRA's proprietary earnings quality database provides a quantitative ranking (by decile) of earnings quality for over 5,000 North American companies. Clients can access the model via the CFRA website and download it monthly. The earnings quality model has been thoroughly back tested and is a proven tool in helping to identify companies that are likely to re-state earnings, face SEC enforcement action and/or class action law suits. Current features of the model include: company accrual risk assessment, portfolio monitoring for accrual risks, and company industry screening.

**How To Make Contact**
Unlimited access to all important
CFRA services @ cfraonline.com

Key contacts are:

Marc Siegel, CPA
Director of Research
+1 301 255 6614
msiegel@cfraonline.com

Carol Tidel, JD
Director of Sales
+1 301 255 6615
ctidel@cfraonline.com

*Industry Sector/Team Leaders*

John LeBarre, CPA, CFA
Technology, Media, Telecom
+1 301 255 6628
jlbarre@cfraonline.com

Jill Gilman, CPA
Healthcare
+1 781 290 0160
jgilman@cfraonline.com

Don Morris, CPA, CFA
Industrials
+1 301 255 6632
dmorris@cfraonline.com

Paul Nagy, CFA
Team Leader Europe (London)
+44 207 842 2875
pnagy@cfraonline.com

Jeremy Perler, CPA, CFA
Consumer/Retail
+1 301 255 6629
jperler@cfraonline.com

Adam Waldski, CFA
Financials
+1 301 255 6633
awaldski@cfraonline.com



# CFRA

May 16, 2006

David Bassett, CFA          301-255-6626          dbassett@cfraonline.com
Jean-Louis Thiémélé         301-255-6645          jthiemele@cfraonline.com

## Options Backdating– Which Companies are at Risk?
A Survey of the Top 100 Users of Stock Options 1997 - 2002

### Key Takeaway

The results of our initial survey on the risk of options backdating at the top 100 users of options suggest that a large number of companies may have taken advantage of the loopholes in the stock option grant reporting regulation, prior to the implementation of Sarbanes-Oxley in 2002. In our view, amongst the top 100 grantors of options, the companies presenting the highest risk of having backdated options are: AMT, BRCD[1], BRCM, CNET, DPTR, FFIV, JNPR, MEDX, MERQ[2], MFE, MSTR, OPWV, RMBS, RSAS, SEPR, SMTC, ZRAN.

### Summary

• We reviewed options granted to executives at the top 100 North American companies[3] ranked by Total Stock-Based Compensation/Revenue in order to evaluate the risk of the company having engaged in option backdating. See "Our Methodology" below.

• CFRA considers a company's options backdating risk to be significant when a company has, on three or more occasions, granted options to executives at exercise prices and dates that matched exactly or were close to a 40-day low in the company's stock price. According to these criteria, 17% of the companies we reviewed are, in our view, at risk for having backdated option grants during the period 1997-2002. The companies with the highest risk of options backdating are: AMT, BRCD, BRCM, CNET, DPTR, FFIV, JNPR, MEDX, MERQ, MFE, MSTR, OPWV, RMBS, RSAS, SEPR, SMTC, ZRAN.

• Several other companies may have taken advantage of the regulatory loopholes in the period 1997-2002, while not meeting our highest risk

[1] BRCD indicated in a 5/16/05 release "that its guidelines regarding stock option granting practices were not followed."
[2] MERQ was included in our analysis and is currently restating its financial statements for past stock option grants.
[3] Appendix 4 lists companies included in the survey.

**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA), ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

## CFRA REPORTS

Previous Report
Options Backdating – Preliminary Analysis

## COMPANIES MENTIONED

ADLR, ALKS, AMCC, AMT, BRCD, BRCM, CNET, DPTR, DRIV, EQIX, ENDP, FDRY, FFIV, COS, INTU, JNPR, MEDX, MERQ, MFE, MLNM, MSTR, NTAP, OPWV, RBAK, RMBS, RNWK, RSAS, SEPR, SMTC, VCLK, VRSN, ZRAN

## CONTRIBUTING AUTHOR

• Nitu Patnaik CPA
Nitu.Patnaik@cfraonline.com
301-255-6541



Stock Option Grant at Mercury Interactive Corp. (MERQ)



criterion for options backdating. These companies granted options to executives at exercise prices and dates that matched or were close to a 40-day low following or preceding a period of material change in the companies stock price once or twice during the six-year period 1997-2002. The companies with a moderate risk of companies backdating are: ADLR, ALKS, AMCC, DRIV, EQIX, ENDP, FDRY, ICOS, INTU, MLNM, NTAP, RBAK, RNWK, VCLK, VRSN.

## Options Backdating Background

Options backdating refers to the practice of selecting "a posteriori" the most advantageous or lowest stock price point within a given period of time to establish the date and exercise price of a company's stock option grant. In addition to the potential financial gain obtained by executives (at the expense of shareholders), this practice allows companies to grant in-the-money stock options without having to recognize the expense on the income statement[4].

As discussed in our preliminary report on Options Backdating, until 2002 the Securities and Exchange Commission (SEC) allowed companies to report option grants up to 20 trading days after the date of the actual grant, thus providing a tempting "window" for companies to select the most beneficial date to maximize the value of the grant. In 2002, the loophole was closed as the reporting deadline was reduced to 2 trading days after the actual date of the grant.

Companies which have repeatedly taken part in options backdating face several risks:

- SEC investigation risk — The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

- Accounting restatement risk — Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications — The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk — If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

## Our Methodology

CFRA used a three-step approach to assess the option backdating risk in this survey. We selected the major users of options, ran a screen using predefined risk assessment criteria, and reviewed stock price trends around the chosen grant dates to assess the backdating risk for each individual grant flagged in our screening process.

---

[4] Under APB 25 the cost of options was calculated using the intrinsic value on the date of the grant, which is zero for at-the-money options. Under FAS 123r, option expense is measured using the fair market value on the date of the grant.

**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

**1 - Major users of options.** To identify the companies who could be at risk for option backdating, we elected to review the firms which utilize a higher ratio of stock-based compensation. Our universe included all North American companies with a market capitalization exceeding $1bn. We used the ratio of Total stock compensation / Revenue as a proxy for companies' use of stock options and ranked our pool of companies according to the 6-year (97-'02) average Total stock compensation / Revenue ratio since the backdating was most likely to occur prior to the Sarbanes-Oxley rule changes in mid-2002. We selected the top 100 companies for further review.

**2 - Risk Assessment Criteria** For each one of the 100 companies selected, we manually reviewed the relevant SEC filings and obtained details of the individual grants made by the company during the period 1997-2002 and assessed the likelihood of options backdating using the following backdating risk assessment criteria:

  - Price on grant date[5] within 105% of the 10 or 40 day period stock price low

  - Stock price range (highest stock price – lowest stock price) is greater than 10% of lowest stock price

**3 - Stock Price Chart Review** We flagged any grant that met the three criteria listed above and reviewed the stock price trends around the chosen grant date to assess the backdating risk.   CFRA believes that the following companies have a higher option backdating risk: AMT, BRCD, BRCM, CNET, DPTR, FFIV, JNPR, MEDX, MERQ, MFE, MSTR, OPWV, RMBS, RSAS, SEPR, SMTC, ZRAN (See **Appendices 1 &2.**)  CFRA believes that ADLR, ALKS, AMCC, DRIV, EQIX, ENDP, FDRY, ICOS, INTU, MLNM, NTAP, RBAK, RNWK, VCLK, VRSN present a moderate risk of options backdating for the period 1997-2002. (See **Appendix 3.**)

The purpose of this analysis is to highlight companies which *could* be at risk for having backdated options during the 1997-2002 time period.  As other (non-public) information would likely be needed to confirm actual instances of backdating, we are not able to conclusively state whether or not backdating occurred.  Because of the large number of companies included in this survey, unless otherwise noted, CFRA has not discussed or confirmed any of these results with the companies named in this report.

---

[5] In many cases, the proxy statement disclosure does not specifically mention a grant date. CFRA estimated the grant date from the expiration date and/or exercise price as compared to market price.

**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



# Appendix 1: Stock Charts of Companies with Higher Option Backdating Risk*:

## American Tower Corp. (AMT)



6/22/98

Although grants expire on 6/21/08, the exercise price implies a grant date of 6/22/98



9/21/00



4/3/01

*Of surveyed companies.



**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

**Broadcom Corp. (BRCM)**





Page5

**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA), ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

Brocade Communications Systems, Inc. (BRCD)



For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA), ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

## CNET Networks Inc. (CNET)









For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

## Delta Petroleum Corp. (DPTR)



For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



F5 Networks Inc. (FFIV)

Juniper Networks Inc. (JNPR)

For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



McAfee Inc. (MFE)

For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

## Medarex Inc. (MEDX)



Although grants expire on 10/31/99, the exercise price implies a grant date of 10/29/99

▲ 10/29/99



Although grants expire on 9/4/07, the exercise price implies a grant date of 9/8/97

▲ 9/8/97



▲ 7/10/02



For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



Mercury Interactive Corp. (MERQ)

**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



Mercury Interactive Corp. (MERQ) - Continued

MicroStrategy Inc. (MSTR)

For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



Openwave Systems Inc. (OPWV)

Rambus Inc. (RMBS)

For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

## RSA Security Inc. (RSAS)







For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

Semtech Corp. (SMTC)











For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



Sepracor Inc. (SEPR)

Zoran Corp. (ZRAN)

For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



## Appendix 2- Higher Risk Companies

| Company | Dates of At-Risk Option Grants | Number of Shares Underlying Grants (in mils.) | N° of at-Risk Grants / Total n° of Grant Dates (97-02) |
|---|---|---|---|
| American Tower Corp (AMT) | 6/22/98 | 1.6 | 3 / 12 |
| | 9/21/00 | 0.8 | |
| | 4/3/01 | 0.005 | |
| Broadcom Corp. (BRCM) | 5/26/00 | 0.3 | 3 / 9 |
| | 7/3/02 | 0.1 | |
| | 8/5/02 | 0.5 | |
| Brocade Communications Systems (BRCD) | 10/4/99 | 0.2 | 6 / 9 |
| | 11/19/99 | 2.1 | |
| | 1/31/00 | 0.4 | |
| | 11/29/00 | 6.1 | |
| | 4/17/01 | 6.5 | |
| | 10/1/01 | 1.9 | |
| CNET Networks Inc (CNET) | 6/3/98 | 0.6 | 4 / 10 |
| | 4/17/00 | 0.5 | |
| | 10/18/00 | 1.1 | |
| | 10/8/01 | 1.1 | |
| Delta Petroleum Corp. (DPTR) | 12/8/97 | 0.5 | 4 / 11 |
| | 7/14/00 | 0.7 | |
| | 1/8/01 | 0.4 | |
| | 10/5/01 | 0.5 | |
| F5 Networks Inc. (FFIV) | 12/29/00 | 0.2 | 3 / 9 |
| | 3/16/01 | 0.4 | |
| | 5/6/02 | 0.5 | |

For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



## Appendix 2: Higher Risk Companies (continued)

| Company | Dates of At-Risk Option Grants | Number of Shares Underlying Grants (in mils.) | N° of at-Risk Grants / Total n° of Grant Dates (97-02) |
|---|---|---|---|
| Juniper Networks Inc. (JNPR) | 10/4/99 | 2.2 | 3 / 6 |
| | 12/21/00 | 0.8 | |
| | 2/28/02 | 1.5 | |
| McAfee Inc. (MFE) | 1/12/98 | 1.4 | 5 / 18 |
| | 1/2/01 | 0.4 | |
| | 4/4/01 | 0.6 | |
| | 1/16/02 | 0.4 | |
| | 10/8/02 | 0.2 | |
| Medarex Inc. (MEDX) | 9/8/97 | 0.2 | 4 / 9 |
| | 10/29/99 | 0.5 | |
| | 9/19/01 | 0.8 | |
| | 7/10/02 | 0.9 | |
| Mercury Interactive Corp (MERQ) | 3/31/97 | 0.3 | 8 / 9 |
| | 1/21/99 | 1.1 | |
| | 7/15/99 | 0.2 | |
| | 1/6/00 | 1.7 | |
| | 5/23/00 | 0.5 | |
| | 1/8/01 | 1.8 | |
| | 11/2/01 | 0.4 | |
| | 1/22/02 | 1.4 | |
| MicroStrategy Inc. (MSTR) | 6/15/98 | 0.1 | 3 / 14 |
| | 8/9/99 | 0.1 | |
| | 7/25/02 | 0.2 | |

**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



## Table 1: Higher Risk Companies (continued)

| Company | Dates of At-Risk Option Grants | Number of Shares Underlying Grants (in mils.) | N° of at-Risk Grants / Total n° of Grant Dates (97-02) |
|---|---|---|---|
| Openwave Systems (OPWV) | 1/8/01 | 0.3 | 4/10 |
| | 7/20/01 | 0.1 | |
| | 8/23/01 | 2.0 | |
| | 10/10/02 | 0.03 | |
| Rambus Inc. (RMBS) | 11/5/98 | 0.3 | 3/10 |
| | 6/21/01 | 0.5 | |
| | 8/23/01 | 1.5 | |
| RSA Security (RSAS) | 10/27/97 | 0.1 | 3/16 |
| | 12/8/99 | 0.1 | |
| | 11/30/00 | 0.4 | |
| Semtech Corp. (SMTC) | 2/26/97 | 0.2 | 4/13 |
| | 11/12/97 | 0.1 | |
| | 2/18/99 | 0.2 | |
| | 2/22/02 | 0.05 | |
| Sepracor Inc. (SEPR) | 6/4/98 | 0.8 | 3/7 |
| | 4/27/00 | 0.4 | |
| | 5/3/01 | 0.4 | |
| Zoran Corp. (ZRAN) | 8/4/98 | 0.4 | 3/13 |
| | 8/4/99 | 0.1 | |
| | 9/19/01 | 0.1 | |

**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA), ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.



ICOS Corp. (ICOS)

Network Appliance Inc. (NTAP)

Millennium Pharmaceuticals (MLNM)

Intuit Inc. (INTU)

For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

Page 29



For exclusive use by CFRA. Printed for Jason Hutto.

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA). ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE. HOWEVER, NO WARRANTIES CAN BE MADE.

## Appendix 4: List of Surveyed Companies: The Top 100 Grantors of Stock Options as a Percentage of Revenue (Mkt Cap Over $1B)^

| ABCO | CCI | GILD | MERQ* | RHAT |
|------|------|------|-------|------|
| ADBE | CELG | GMST | MFE | RMBS |
| ADLR | CEPH | HGSI | MLNM | RNWK |
| AFFX | CIEN | HLTH | MNCP | RSAS |
| AKAM | CNET | IART | MOGN | SCMR |
| ALKS | CNXT | ICOS | MOVE | SEPR |
| ALXN | CREE | IDCC | MSTR | SMTC |
| AMCC | CSGP | ILMN | MVSN | SOHU |
| AMLN | CTXS | IMCL | NBIX | SONS |
| AMT | CYMI | INFA | NKTR | SWKS |
| AMZN | CYTC | INTU | NTAP | TIBX |
| ARTC | DGIN | IVGN | OPWV | TSRA |
| BE | DPTR | JCOM | OSIP | VCLK |
| BEAS | DRIV | JDSU | OVTI | VMSI |
| BIIB | EBAY | JNPR | PCLN | VRSN |
| BMRN | ELX | KFX | PDLI | VRTX |
| BRCD | ENDP | KOSP | PMCS | WEBX |
| BRCM | EQIX | LNG | PMTC | XMSR |
| BWNG | FDRY | MEDI | RBAK | YHOO |
| CBST | FFIV | MEDX | RFMD | ZRAN |

^ We screened the above pool for companies most likely to have backdated option grants according to our methodology. Companies covered in our survey but not mentioned in our list of high or moderate risk companies should not be deemed to have no option backdating risk.

*Currently in the process of restating for option grant dating.



**For exclusive use by CFRA. Printed for Jason Hutto.**

© 2006 BY THE CENTER FOR FINANCIAL RESEARCH AND ANALYSIS (CFRA), ALL RIGHTS RESERVED.
THE ABOVE ANALYSIS IS BASED UPON DATA SOURCES DEEMED TO BE RELIABLE; HOWEVER, NO WARRANTIES CAN BE MADE.

# EXHIBIT 2

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

(Copyright (c) 2006, Dow Jones & Company, Inc.)
The Wall Street Journal

May 18, 2006 Thursday

**SECTION:** Heard on the Street; Pg. C1

**LENGTH:** 1165 words

**HEADLINE:** Criminal Probe Of UnitedHealth's Options Begins

**BYLINE:** By James Bandler, Charles Forelle and John Hechinger

**BODY:**

FEDERAL PROSECUTORS in Manhattan began a criminal probe of options-granting practices at UnitedHealth Group Inc., and Vitesse Semiconductor Corp. fired three top managers, including its chief executive officer, in the latest developments in a stock-options scandal that is roiling corporate suites.

UnitedHealth also said the Internal Revenue Service had made a request for documents, suggesting that the agency may be looking at the tax implications of possibly misdated stock options at the giant health insurer. UnitedHealth previously said that because of a "significant deficiency" in its options administration and accounting, it may need to restate at least three years of financial results and lose tax deductions.

The criminal probe at UnitedHealth comes weeks after federal prosecutors in New York's Eastern District, based in Brooklyn, subpoenaed Comverse Technology Inc. in a corporate-fraud probe of options issues. Three executives from Comverse have resigned.

UnitedHealth, of Minnetonka, Minn., disclosed late yesterday that it had received a subpoena from the U.S. attorney's office in the Southern District of New York. People familiar with the matter say that at least one other company besides UnitedHealth has received a subpoena, and that the probe by the Southern District appears to be broad. Counting actions at Vitesse and Comverse, eight top officials have resigned or been fired at three companies in recent weeks as government authorities and corporate boards probe the possible backdating of stock options.

At Vitesse, UnitedHealth and other companies, options to top executives were frequently granted at low prices, often just before shares rose sharply -- in patterns with only a scant chance of occurring randomly. The Securities and Exchange Commission is examining about 20 companies to see whether grants were improperly backdated, say people familiar with the matter. A person familiar with the matter says Vitesse, a microchip maker based in Camarillo, Calif., is one of these companies. UnitedHealth has said it is the subject of an "informal" SEC probe.

UnitedHealth said the IRS request covered documents related to stock options and other compensation dating back to 2003; the subpoena, it said, runs back to 1999. Stock options usually give employees the right to buy shares later at the price of the stock on the date of the grant. If shares rise from the grant price, the employee profits by exercising the option and selling the shares. Stock options are often used to reward executives for strong share performance. If options are backdated to times when shares are especially low, their potential for profit is enhanced. Backdating is not necessarily illegal in itself. But granting an option at below-market value without disclosing the discount could violate SEC rules. It also can lead to accounting and tax troubles.

Yesterday, Vitesse said it dismissed CEO Louis Tomasetta, who previously had been placed on administrative leave. The company named Christopher Gardner as his successor.

Mr. Tomasetta regularly received option grants dated ahead of large rises in the company's share price, often at low points, reaping tens of millions of dollars, according to an analysis of Vitesse and other companies that appeared in The Wall Street Journal in March.

Mr. Tomasetta has said all employees received grants on the same days. Mr. Tomasetta's wife said he wouldn't be available for comment yesterday. Mr. Gardner didn't return phone calls seeking comment about the options.

Vitesse also dismissed Yatin Mody, its chief financial officer, and Eugene Hovanec, executive vice president. Messrs. Mody and Hovanec couldn't be reached for comment. Previously, the company said the three executives had been put on leave because they were involved in "issues related to the integrity of documents relating to Vitesse's stock option grant process."

Shawn C.A. Hassel of Alvarez & Marsal LLC, a New York turnaround firm, was appointed as the company's chief financial officer, and Vitesse said a board-committee investigation had been expanded to include "general revenue recognition" and practices concerning the "cash position" at the end of financial periods.

"In spite of the recent challenges we face . . . Vitesse remains focused on executing our strategic business plan to capitalize on the investments we've made," Mr. Gardner said in a statement.

In addition to Vitesse, UnitedHealth and Comverse, three other companies whose CEOs routinely received grants ahead of sharp stock increases were featured in the March Wall Street Journal article, which showed the probability of the grant dates occurring randomly was extremely small. All six have since said they have begun probes by outside directors and lawyers.

Wall Street's interest in identifying potential options problems at companies is also on the rise. An accounting-research firm this week identified 17 companies it termed as having "the highest risk of having backdated options." The research firm, the Center for Financial Research and Analysis, based its analysis on regulatory records and trading patterns.

Marc Siegel, director of research at CFRA, said the firm's clients, which include investment managers, have been seeking to identify companies with risky options patterns. CFRA looked at 100 companies that issued a high proportion of options relative to their total executive compensation. It then identified those that, on three or more occasions, granted options at exercise prices that matched, or were close to, lows of the company stock price between 1997 and 2002, followed by a bounce of at least 10% in share price.

The analysis doesn't prove that backdating occurred, but Mr. Siegel said the companies it named "warrant further attention and may be further at risk with having problems with their options." After 2002, backdating became more difficult because the SEC required companies to file forms disclosing option grants within two days of the grant dates. Before the new rules established by the Sarbanes-Oxley corporate-governance act, executives could wait weeks or even several months to report grants to the SEC.

Among the 17 were Juniper Networks Inc., a Sunnyvale, Calif., networking-equipment company; Broadcom Corp., an Irvine, Calif., semiconductor company specializing in telecommunications; and CNET Networks Inc., a San Francisco operator of Web sites in technology, entertainment and other fields. Not all the grants issued by the companies were considered to be unusual. And many of the at-risk companies had options grants that didn't raise red flags based on CFRA's analysis. The majority of grants issued by Broadcom and CNET, for example, were considered unremarkable by CFRA. Half of the grants to Juniper were considered at risk by CFRA.

Spokesmen for Juniper and Broadcom declined to comment. A spokeswoman for CNET said the company was looking into the matter.

---

Vanessa Fuhrmans contributed to this article.

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** May 18, 2006

# EXHIBIT 3

1 of 1 DOCUMENT

Copyright 2006 Globe Newspaper Company
The Boston Globe

May 23, 2006 Tuesday
THIRD EDITION

**SECTION:** BUSINESS; Pg. E1

**LENGTH:** 631 words

**HEADLINE:** TIMING IS EVERYTHING

**BYLINE:** BY STEVEN SYRE

**BODY:**

How can you tell whether a company is playing fast and loose with the stock option awards showered upon its executives?

That's a popular question at the moment, as regulators and prosecutors look into the timing of option awards issued to the executives who run public companies.

Do companies find the perfect moment to award options, just before good news that will immediately drive up their value or right after bad news that make them a better deal than they would have been days or weeks earlier?

Worse, do companies back-date awards to maximize their value to executives with the benefit of illegal hindsight?

Occasionally, the timing is so striking it screams out for scrutiny. More often, option timing seems fortuitous or even suspicious, but hardly conclusive. In those cases, you need a subpoena to find out what really happened.

Two local companies, American Tower Corp. of Boston and RSA Security Inc. of Bedford, are responding to questions from the Securities and Exchange Commission about their option awards. Both appeared in a recent report by the Center for Financial Research & Analysis, which identified 17 public firms that made ideally timed awards between 1996 and 2002.

Brooks Automation Inc. of Chelmsford said yesterday that it received a grand jury subpoena requesting stock option records, and two of its directors resigned last week. Brooks did not return a call after issuing a statement.

Analog Devices Inc. of Norwood would pay the SEC $3 million in a tentative settlement of a stock option investigation.

The option patterns at these companies reflect a range of suspect timing. Exhibit A: three awards issued by Brooks Automation in 1999 and 2000.

Brooks gave executives a round of options in the first days of 1999, at $14.625, and the company's stock climbed over $25 in a month. Brooks shares never closed below $14.625 all year. Options were awarded the following January, and it happened again. Brooks stock doubled from there within a month.

Another 2000 award by Brooks came at the end of a big slide in the company's stock price, which had been cut in half over the course of a month. Brooks awarded more stock options on May 31, the day its stock hit bottom in that slide, through the company's shares would end the year even lower.

American Tower and RSA Security displayed their own good timing in awarding options, but the picture isn't so vivid. Some of their awards hand out options to executives soon after stock prices sink or not long before shares take off. Not smoking-gun material, but reasons to look closer.

TIMING IS EVERYTHING The Boston Globe May 23, 2006 Tuesday

Executives at both companies have other reasons to be thrilled with their options, enjoying appreciation that wasn't always shared by their stockholders.

American Tower, a stock story of boom, bust, and boom, has made executives rich. The company's stock soared over $50 in 2000 but crashed to a low of 75 cents two years later. Then American Tower stock staged a big comeback, peaking recently over $35.

Stockholders who stayed with the company through thick and thin had a rough ride. But American Tower executives received lots of low-priced options in the bleak years. They cashed in $11 million in options in recent years and were still sitting on many more worth $75 million earlier this year.

RSA executives benefited from a 2002 program to reprice options made worthless by the company's stock slump. The options, as originally granted, would still hold no value today but appreciated substantially since their repricing.

Many companies did the same thing, but pubic investors who owned RSA stock enjoyed no similar recovery plan.

There are so many ways to make money on executive stock options, it's hard to imagine why anyone would bother to cheat. But a few do.

Steven Syre is a Globe columnist. He can be reached at syre@globe.com.

**NOTES:** BOSTON CAPITAL ; STEVEN SYRE

**GRAPHIC:** CHART

**LOAD-DATE:** May 23, 2006

# EXHIBIT 4



**PAGE 1**

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS FILED FROM AND INCLUDING THE RESTATED
CERTIFICATE OR A MERGER WITH A RESTATED CERTIFICATE ATTACHED OF
"RSA SECURITY INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

RESTATED CERTIFICATE, FILED THE TWENTY-FIRST DAY OF
DECEMBER, A.D. 1994, AT 11:31 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE FIRST DAY OF AUGUST,
A.D. 1996, AT 12:30 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE SEVENTH DAY OF MAY, A.D.
1999, AT 10:30 O'CLOCK A.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "SECURITY
DYNAMICS TECHNOLOGIES, INC." TO "RSA SECURITY INC.", FILED THE
TENTH DAY OF SEPTEMBER, A.D. 1999, AT 12 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE SIXTH DAY OF JULY, A.D.
2000, AT 1:30 O'CLOCK P.M.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTY-SEVENTH DAY OF
DECEMBER, A.D. 2004, AT 1:19 O'CLOCK P.M.

CERTIFICATE OF MERGER, FILED THE TWENTY-EIGHTH DAY OF

2091910   8100X

060367600

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State
AUTHENTICATION: 4681354

DATE: 04-20-06



*The First State*

PAGE  2

DECEMBER, A.D. 2004, AT 11:24 O'CLOCK A.M.

2091910  8100X

060367600

Harriet Smith Windsor, Secretary of State

AUTHENTICATION:  4681354

DATE:  04-20-06

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 11:31 AM 12/21/1994
944251642 - 2091910

## THIRD RESTATED

## CERTIFICATE OF INCORPORATION

## OF

## SECURITY DYNAMICS TECHNOLOGIES, INC.

Security Dynamics Technologies, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify as follows:

1.    The Corporation filed its original Certificate of Incorporation with the Secretary of State of Delaware on May 23, 1986. A Second Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on September 7, 1988, which Second Restated Certificate of Incorporation was amended by a Certificate of Amendment of Second Restated Certificate of Incorporation filed on April 27, 1990, a Second Certificate of Amendment of Second Restated Certificate of Incorporation filed on September 21, 1990, a Third Certificate of Amendment of Second Restated Certificate of Incorporation filed on March 19, 1991, a Fourth Certificate of Amendment of Second Restated Certificate of Incorporation filed on July 13, 1993, a Fifth Certificate of Amendment of Second Restated Certificate of Incorporation filed on October 28, 1993, a Sixth Certificate of Amendment of Second Restated Certificate of Incorporation filed on October 24, 1994, and a Certificate of Retirement of Stock filed on even date herewith.

2.    At a meeting of the Board of Directors of the Corporation, a resolution was duly adopted, pursuant to

1.    Voting.    The holders of the Common Stock are entitled to
one vote for each share held at all meetings of stockholders.
There shall be no cumulative voting.

The number of authorized shares of Common Stock may be
increased or decreased (but not below the number of shares thereof
then outstanding) by the affirmative vote of the holders of a
majority of the stock of the Corporation entitled to vote, ir-
respective of the provisions of Section 242(b)(2) of the General
Corporation Law of Delaware.

2.    Dividends.    Dividends may be declared and paid on the
Common Stock from funds lawfully available therefor as and when
determined by the Board of Directors.

3.    Liquidation.    Upon the dissolution or liquidation of the
Corporation, whether voluntary or involuntary, holders of Common
Stock will be entitled to receive all assets of the Corporation
available for distribution to its stockholders.

FIFTH.    The Corporation shall have a perpetual existence.

SIXTH.    In furtherance of and not in limitation of powers
conferred by statute, it is further provided that the Board of
Directors is expressly authorized to adopt, amend or repeal the
By-Laws of the Corporation.

SEVENTH.    Whenever a compromise or arrangement is proposed
between this corporation and its creditors or any class of them
and/or between this corporation and its stockholders or any class
of them, any court of equitable jurisdiction within the State of
Delaware may, on the application in a summary way of this
corporation or of any creditor or stockholder thereof, or on the
application of any receiver or receivers appointed for this
corporation under the provisions of section 291 of Title 8 of the
Delaware Code or on the application of trustees in dissolution or
of any receiver or receivers appointed for this corporation under
the provisions of section 279 of Title 8 of the Delaware Code
order a meeting of the creditors or class of creditors, and/or of
the stockholders or class of stockholders of this corporation, as
the case may be, to be summoned in such manner as the said court
directs.    If a majority in number representing three-fourths in
value of the creditors or class of creditors, and/or of the
stockholders or class of stockholders of this corporation, as the
case may be, agree to any compromise or arrangement and to any
promise or arrangement, the said compromise or arrangement and the
said reorganization shall, if sanctioned by the court to which the
said application has been made, be binding on all the creditors or
class of creditors, and/or on all the stockholders or class of

- 3 -

stockholders, of this corporation, as the case may be, and also on this corporation.

EIGHTH.   Except to the extent that the General Corporation Law of the State of Delaware prohibits the elimination or limitation of liability of directors for breaches of fiduciary duty, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director, notwithstanding any provision of law imposing such liability. No amendment to or repeal of this provision shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment.

NINTH.   1.   <u>Action, Suits and Proceedings Other than by or in the Right of the Corporation</u>. The Corporation shall indemnify each person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation), by reason of the fact that he is or was, or has agreed to become, a director or officer of the Corporation, or is or was serving, or has agreed to serve, at the request of the Corporation, as a director, officer or trustee of, or in a similar capacity with, another corporation, partnership, joint venture, trust or other enterprise (including any employee benefit plan) (all such persons being referred to hereafter as an "Indemnitee"), or by reason of any action alleged to have been taken or omitted in such capacity, against all expenses (including attorneys' fees) judgment, fines and amounts paid in settlement actually and reasonably incurred by him or on his behalf in connection with such action, suit or proceeding and any appeal therefrom, if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of <u>nolo contendere</u> or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful. Notwithstanding anything to the contrary in this Article, except as set forth in Section 6 below, the Corporation shall not indemnify an Indemnitee seeking indemnification in connection with a proceeding (or part thereof) initiated by the Indemnitee unless the initiation thereof was approved by the Board of Directors of the Corporation.

- 4 -

SEP 09 1999 16:54 FR HALE AND DORR LLP

TO 913926
STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 12:00 PM 09/10/1999
991378772 - 2091910

## CERTIFICATE OF OWNERSHIP AND MERGER
## MERGING
## RSA DATA SECURITY, INC.
## INTO
## SECURITY DYNAMICS TECHNOLOGIES, INC.

Pursuant to Section 253 of the General Corporation Law of the State of Delaware,

Security Dynamics Technologies, Inc., a corporation organized and existing under the

General Corporation Law of the State of Delaware (the "Corporation"), does hereby

certify:

FIRST:    That the Corporation is incorporated pursuant to the General

Corporation Law of the State of Delaware.

SECOND:    That the Corporation owns all of the outstanding shares of the

capital stock of RSA Data Security, Inc., a Delaware corporation ("RSA").

THIRD:    That the Corporation, by the following resolutions of its Board of

Directors, duly adopted at a meeting held on July 14, 1999, determined to merge RSA

into the Corporation and change the Corporation's corporate name to "RSA Security Inc."

on the conditions set forth in such resolutions:

RESOLVED:    That the Corporation merge into itself its wholly owned

subsidiary, RSA Data Security, Inc. ("RSA"), and assume all of said subsidiary's liabilities

and obligations; and that upon the effectiveness of such merger, the Corporation's

corporate name be changed to "RSA Security Inc."

RESOLVED:    That each of the Chairman of the Board and Chief Executive

Officer and the President of the Corporation be and hereby is authorized and directed

to prepare, execute and file with the Secretary of State of the State of Delaware a

SEP 09 1999 16:54 FR HALE AND DORR LLP          TO 913026748340     P.03

SEP 07 1999 20:03 FR HALE & DORR LLP            TO 17813015444      P.04

Certificate of Ownership and Merger setting forth a copy of the resolutions to merge RSA into the Corporation and to assume the liabilities and obligations of said subsidiary and to change the Corporation's corporate name to "RSA Security Inc." upon the effectiveness of such merger, the execution and filing thereof to be conclusive evidence of such approval and the authorization therefor by the Board of Directors of the Corporation.

IN WITNESS WHEREOF, the Corporation has caused its corporate seal to be affixed and this Certificate of Ownership and Merger to be signed by its Chairman of the Board and Chief Executive Officer this 10th day of September, 1999.

SECURITY DYNAMICS TECHNOLOGIES, INC.

By: _____
Charles R. Stuckey, Jr.
Chairman of the Board and
Chief Executive Officer

2

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

RICHARD J. TADDY,                    )
Derivatively on behalf of           )
PRIMUS TELECOMMUNICATIONS            )
GROUP, INC.,                         )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )
                                     )     No. 1:04cv1051
K. PAUL SINGH, ET AL.,               )
                                     )
        Defendants,                  )
                                     )
and                                  )
                                     )
PRIMUS TELECOMMUNICATIONS            )
GROUP, INC., a Delaware              )
Corporation,                         )
                                     )
        Nominal Defendant.           )

DEC = 8 2004

## MEMORANDUM OPINION

Before the Court is defendants' Motion to Dismiss, in
which they argue that the Court lacks subject matter
jurisdiction to hear this civil action because plaintiff failed
to make a demand on the directors before bringing this action
and failed to show that a demand would be futile.   Defendants
also allege that even if the Court had jurisdiction to hear
this civil action, it would have to dismiss the Complaint as
lacking the requisite specificity.   For the reasons stated in
open court, as amplified by this Memorandum Opinion, the Motion
will be granted.

**Introduction**

This is a shareholder derivative action brought by Primus
Telecommunications Group (Primus)[1] shareholder Richard J. Taddy
on behalf of the corporation.[2]  Plaintiff has sued officers and
directors of the corporation for violations of state law
stemming from their alleged intentional issuance of false and
misleading public statements, which he claims artificially
inflated Primus's stock price, which later plummeted when the
corporation announced that it had posted a loss.  Plaintiff's
state law claims are before this Court in diversity; Taddy is a
Nevada citizen, Primus is incorporated in Delaware and has its
headquarters in Virginia and none of the named defendants is a
citizen of Nevada.[3]  As is detailed below, the alleged damages
are in the millions.  Defendants do not contest that the Court

---

[1] Primus is a telecommunications services provider involved
in the voice, Internet and data hosting services markets.  Its
primary markets are the United States, Australia, Canada and the
U.K.

[2] It is not contested that Taddy held Primus stock at all
times relevant to this action, as required for a shareholder to
file a derivative suit.

[3] The individual Primus defendants are: (1) K. Paul Singh,
Chairman, President, CEO and Director, (2) Neil L. Hazard, CFO,
COO and Executive Vice President, (3) David E. Hershberg,
Director, (4) Nick Earle, Former Director, (5) Pradman P. Kaul,
Director, (6) John G. Puente, Director, (7) Douglas M. Karp,
Director, (8) John F. DePodesta, Executive Vice President, Chief
Legal Officer, Secretary and Director, (9) Paul G. Pizzani,
Director and (10) Geoffrey L. Hamlin, whom plaintiff appeared to
concede at oral argument is not a director.

has personal jurisdiction over them and that venue in this
district is appropriate. Given defendants' associations with
and actions on behalf of Primus, the headquarters of which is
located in this jurisdiction, the Court finds that it does have
personal jurisdiction over the defendants and that venue lies
in this district.

Plaintiff alleges that the individual defendants breached
their duties of loyalty to the corporation by causing Primus,
or allowing other defendants to cause Primus, to misrepresent
its financial prospects. In a six-count Complaint, plaintiff
alleges (1) breach of fiduciary duty for insider selling and
misappropriation of information (alleged only against those who
sold stock), (2) breach of fiduciary duty against all
defendants (3) abuse of control, (4) gross mismanagement, (5)
waste of corporate assets and (6) unjust enrichment. Plaintiff
claims that Primus was damaged because it is now the subject of
several federal securities class action lawsuits, which have
caused the corporation to expend significant assets on its
defense. Plaintiff also claims that the defendants' alleged
actions have damaged Primus's corporate image and goodwill. As
such, plaintiff seeks (1) restitution in the amount of damages
sustained by Primus, (2) equitable or injunctive relief,
including attaching, impounding, imposing a constructive trust
on or otherwise restricting the proceeds of defendants'

allegedly illegal activities to ensure that Primus has an
effective remedy, (3) disgorgement of the defendants'
individual profits, benefits and compensation and (4)
attorneys' fees and costs.

In a separate section of the Complaint, but not pled as a
specific cause of action, plaintiff also alleges conspiracy,
aiding and abetting and concerted action.  The course of
conduct in which plaintiff claims defendants conspired was
allegedly designed to (1) conceal the fact that Primus was
misrepresenting its financial prospects to artificially inflate
the stock price, (2) maintain defendants' positions at Primus,
(3) deceive the investing public, including Primus shareholders
and (4) cover up defendants' illegal actions and breaches of
duty.  Plaintiff appears to base this conspiracy charge on the
same "specific, false statements" that defendants allegedly
made about Primus's financial and business prospects.  He
claims that all members of the Board of Directors were members
of the conspiracy by virtue of their authority to control the
corporation.  However, plaintiff cites no specific agreements
or acts regarding this alleged collusion.

In their Motion to Dismiss, defendants primarily argue
that plaintiff failed to make a demand that the directors bring
the suit on the corporation's behalf or to show that the demand
requirement should be excused as futile; if established, such

4

failures would be fatal to plaintiff's derivative action.
Defendants also argue that even if the Complaint were properly
before the Court procedurally, it should be dismissed because
it fails to state a claim under the heightened pleading
standards required for fraud actions and/or because defendants
are exculpated by Primus's charter from non-fraud claims.

### Background

In evaluating this Motion to Dismiss, the Court has
considered the Complaint's allegations of the facts, which
include voluminous excerpts from Primus press releases.  The
Court has also considered information obtained from Securities
and Exchange Commission filings and other similar records,
which defendants reference in their pleadings and which the
Court may review in considering a Motion to Dismiss.  See
Suntrust Bank v. Aetna Life Ins. Co., 251 F. Supp. 2d 1282,
1287 (E.D. Va. 2003); see also LaGrasta v. First Union Secs.,
Inc., 358 F.3d 840, 842 (11th Cir. 2004).  Only those facts
that are most pertinent to the issues in this action and the
Motion to Dismiss will be discussed in this Opinion.

The Complaint alleges that during the "relevant period"
between November 2003 and the present, Primus's shares traded
at inflated levels as a result of materially false and
misleading statements defendants issued to the investing public
regarding Primus's business and prospects.  To support this

5

claim, the Complaint lists "true facts" allegedly known by each of the defendants but concealed from the investing public during that period: (1) that Primus was experiencing massive pricing pressures on its international long-distance business and that its minutes of use were declining, (2) that contrary to its projections, Primus would actually lose money for the second half of 2004 and that the second quarter projections were grossly overstated (3) that Primus's business model was incredibly weak, which contributed to its inability to raise capital for the new projects required to achieve even the reduced projections, (4) that Primus was drowning in competition in Canada and Australia and (5) that as a result of these "true facts," Primus's value is actually less than its debt.   The Complaint charges that because of the false statements issued by defendants to conceal these "true facts," Primus's shares traded at inflated prices, defendants were able to make a $240 million note offering and a number of the defendants profited from stock sales collectively totaling $27 million.   Finally, the Complaint asserts that on July 29, 2004, after the market had closed, defendants caused Primus to issue a press release announcing a loss for the second quarter of that year, which missed Wall Street's projections and Primus's own forecast and caused the stock price to drop more than 50% in one day (from $1.70 to $1.52).

6

For each defendant, the Complaint recites a variation of
the broad allegation that the individual "knew adverse non-
public information about the business of Primus, as well as its
finances, markets and present and future business prospects,
via access to internal corporate documents, conversations and
connections with other corporate officers and employees,
attendance at management and Board of Directors' meetings and
committees thereof and via reports and other information
provided to him in connection therewith."  The Complaint does
not specify any particular piece of adverse non-public
information in the possession of a given individual, nor does
it pinpoint communications or meetings in which such
information was disseminated or discussed.  Nevertheless, it
asserts that each defendant "participated in the issuance of
false and/or misleading statements, including the preparation
of false and/or misleading press releases."  The only specific
information included regards the individual compensation and/or
stock sales of a number of the defendants.[4]

In a section titled "Improper Statements," the Complaint
excerpts press releases issued by Primus, beginning in November

---

[4] Defendants challenge the accuracy of some of this
information, such as the amount of individual defendants' stock
sales, and support many of their challenges with SEC filings and
other public documents.  As noted above, the Court may review
this information in considering defendants' Motion to Dismiss.

7

2003, with numerous positive statements highlighted in bold.[5]
To support the allegation that these statements were knowingly
false and improper, the Complaint repeats the list of "true
facts" set out above but does not add any concrete information
in support of these broad, unsubstantiated assertions.[6]

The Complaint next charts the stock sales by five
defendants, Singh, Pizzani, Kaul, Herschberg, and DePodesta,
between November 7, 2003, and May 27, 2004.[7]  These sales were
for prices ranging from $11.30 down to $5.99.  The Complaint
does not address the percentage of holdings that each
individual sold.

Finally the Complaint alleges that demand on the officers
would be futile because (1) those selling stock received a
personal benefit from their insider trading and therefore are
interested, (2) no member of the Board would sue those on the
Compensation Committee, who were among the wrongdoers, because

---

[5] Defendants note in their Motion to Dismiss that these
excerpts, and even the sections chosen to be highlighted, appear
to be lifted verbatim from the federal securities class actions
consolidated before this Court as Panagoulias Group, et al. v.
Primus Telecommunications Group, et al., No. 1:04cv970.

[6] At oral argument, defendants offered as an example of the
vagueness and inaccuracy of the Complaint that plaintiff cannot
point to any statement by any director that contradicts the
conceded fact that Primus's minutes of use were declining.

[7] As defendants pointed out at oral argument, the Complaint
improperly includes sales of stock that occurred before the first
allegedly false press release was issued on November 11, 2003.

their own financial interests would be jeopardized, (3) those
employed by the corporation are not independent from any of the
directors, a number of whom are interested, because they depend
on others' backing for their livelihood, (4) any director, such
as those on the Audit Committee, who breached his own duties
would not sue himself, (5) all of the defendants have inter-
related business and personal relationships that constitute
insurmountable conflicts of interest, (6) those with unvested
stock options would not sue themselves because the vesting is
contingent on remaining a member of the Board and (7) changes
in Primus's insurance mean that the policy would not cover
defendants' alleged breaches.

**Discussion**

I.   The Demand Requirement

    A.   Delaware Legal Standards

As a general rule, because a corporation's directors are
empowered to control its business affairs, before filing a
derivative action, a shareholder must demand that the directors
pursue a claim on behalf of the corporation, Rales v. Blasband,
634 A.2d 927, 932 (Del. 1993);[8] otherwise, a court must dismiss
even a potentially meritorious claim.  Kaufman v. Belmont, 479

---

[8] Demand requirements for a derivative suit are determined
by the law of the state of incorporation. Kamen v. Kemper Fin.
Servs., Inc., 500 U.S. 90, 108-09 (1991). Accordingly, the Court
will apply Delaware law in evaluating the demand issue.

9

A.2d 282, 286 (Del. Ch. 1984).   Limited exceptions to this
rule can arise if the shareholder made a demand that the
directors refused or if demand is excused as futile because the
directors are deemed incapable of making an impartial decision
regarding the merits of the charges.   Rales, 634 A.2d at 932.
Regarding futility, when officers' alleged wrongdoing does not
involve a particular business transaction, but rather a broader
course of conduct or breach of duty, the test of whether demand
should be excused is "whether the board that would be
addressing the demand can impartially consider its merits
without being influenced by improper considerations."[9]  Id. at
934.   In practical terms, this involves a determination of
whether "the particularized factual allegations of a derivative
stockholder complaint create a reasonable doubt that, as of the
time the complaint is filed, the board of directors could have
properly exercised its independent and disinterested business
judgment in responding to the demand."[10]  Id.  (emphasis added).

---

[9] The court distinguished such a situation from that
contemplated by the Aronson test, the second prong of which
considers whether the "challenged transaction" was a proper
exercise of business judgment. See Aronson v. Lewis, 473 A.2d 805
(1984), overruled in part on other grounds by Brehm v. Eisner,
746 A.2d 244 (Del. 2000). However, the premise behind that
landmark test and the test set forth in Rawles are the same.

[10] This particularity requirement for pleading derivative
actions derives from Delaware's Chancery Court Rule 23.1, which
states in relevant part:
   In a derivative action . . . [t]he complaint shall . . .
   allege with particularity the efforts, if any, made by

10

The pleading requirements for demand futility set a high

bar for derivative plaintiffs. First, and critical to the

assessment of defendants' Motion to Dismiss, is the Delaware

courts' emphasis on the requirement that plaintiffs allege with

particularity the reasons why demand allegedly would be futile.

See, e.g., Rattner v. Bidzos, No. Civ.A. 19700, 2003 WL

22284323, at *7-10 (Del. Ch. Oct. 7, 2003)(holding demand

futility inadequately pled because plaintiff "merely posit[ed],

without any particularized facts, that [defendants] knew of (or

directly participated in) allegedly material misstatements");

White v. Panic, 793 A.2d 356, 364 (Del. Ch. 2000)("For all of

its colorful language, what is missing from the complaint, in

terms of details of actions taken by the Director Defendants,

is at least as important as what is alleged."). In Brehm v.

Eisner, the court specifically differentiated this requirement

from the general notice pleading standard. See 746 A.2d 244,

254 (Del. 2000). The court held instead that demand futility

cannot be pled by "[a] prolix complaint larded with conclusory

language." Id. Also of importance, directors are entitled to

a presumption that they would be faithful to their fiduciary

---

the plaintiff to obtain the action he desires from the
directors or comparable authority and the reasons for his
failure to obtain the action or for not making the
effort.
This rule is "virtually identical" to Fed. R. Civ. P. 23.1.
Kaufman, 479 A.2d at 286.

11

duties and would pursue meritorious claims.  Beam v. Stewart,
845 A.2d 1040, 1048-49 (Del. 2004).  Id.  Finally, a plaintiff
must allege that a majority of the board would be unable to
exercise objective judgment on the merits of the demand because
those members are either (1) interested in the outcome of the
litigation or (2) otherwise not independent.  Id. at 1049.

        1.   Interested Directors

    A director may be deemed interested if he stands to
benefit from, or be hurt by, the outcome of the litigation.
Id.  To plead such interest sufficiently, a plaintiff must
allege with particularity that the director faces a
"substantial likelihood of personal liability,"  Rawles, 634
A.2d at 936, and cannot simply allege that no director could
reasonably be expected to sue himself.  E.g., Arsonson, 473
A.2d at 818.  In addition, and of particular relevance to this
action, a director's sale of stock at a profit is not alone
sufficient to render that director unable to consider demand
objectively.  Rattner, 2003 WL 22284323, at *11.  Further,
collective totals of board members' stock sales are not
properly considered in assessing demand futility.  Id.
Instead, the plaintiff must plead particularized facts to show
that each sale by each individual was undertaken (1) "on the
basis of, and because of, adverse material non-public
information," id., and (2) with scienter, or fraudulent intent.

12

McCall v. Scott, 239 F.3d 808, 825 (6th Cir. 2001); Guttman v.
Huang, 823 A.2d 492, 505, 508 (Del. Ch. 2003). In addition, a
director's retention of a sizeable portion of his shares
undermines any claim of improper trading. In re Advanta Corp.
Secs. Litig., 180 F.3d 525, 539 (3d Cir. 1999).

2. Dependent Directors

A director's independence must be assessed based on the
facts of the particular case, and a plaintiff must allege that
a given director is so "beholden" to an *interested* director
that the beholden director would be incapable of exercising his
own judgment regarding the merits of the demand without
improper considerations. See Beam, 845 A.2d at 1049-50. Of
particular significance to the Complaint under consideration,
Delaware courts have spoken at length about the factors that do
*not* necessarily render a director so beholden. For example,
allegations of personal friendship or an outside business
relationship, without specific factual allegations that the
relationship would produce bias, are insufficient to raise
reasonable doubt about a director's independence. Id. at 1051.
Indeed, the plaintiff "must plead facts that would support the
inference that because of the nature of a relationship or
additional circumstances other than the interested director's
stock ownership or voting power, the non-interested director
would be more willing to risk his or her reputation than risk

13

the relationship with the interested director." Id. at 1052.
Similarly, directors are not, without more, dependent upon
others who control their compensation or position. E.g.,
Panic, 793 A.2d at 366; see also Grobow v. Perot, A.2d 180, 188
(Del. 1988), overruled on other grounds by Brehm v. Eisner, 746
A.2d 244 (Del. 2000).

B.   Plaintiff's Allegations of Futility

As in Panic, plaintiff's "colorful language" and repeated
allegations that a majority of the Primus Board is unable to
consider the merits of demand objectively cannot conceal his
failure to support these allegations with particularized facts.
Further, in some instances, even the facts as alleged would not
render the directors interested or too beholden to exercise
sound and objective judgment.

For example, in his Opposition, plaintiff erroneously
argues that all defendants who sold stock are automatically
interested because they benefitted personally from "a
transaction that is not equally shared by the stockholders."
This standard applies only when the demand concerns a
particular transaction considered by the Board, which is not
the case in this action.  To follow plaintiff's logic would
create a per se rule that all directors who sell shares of
their corporation's own stock lose their objectivity with
regard to all demand requests; this result is nonsensical and

14

as noted above, has been explicitly rejected by Delaware courts. To substantiate his claim, plaintiff would need to specify when each defendant obtained particular "material non-public information" that prompted that defendant to execute a particular stock sale. Simply alleging that the defendants must have possessed information by virtue of their positions is not enough. See In re Advanta, 180 F.3d at 539. The Complaint, however, only identifies the dates and amounts of the sales and cites to the conclusory allegations that (1) at the time of those sales, the press releases were positive but the "business model was incredibly weak" and (2) Primus "would actually lose money in 2004." Such allegations are insufficient. Further, merely listing the amounts of stock sold by each director does not sufficiently allege that any given transaction appeared to have been undertaken with wrongful intent,[11] which would require at the very least allegations of the percentage, not the raw quantity, of stock sold.[12]   See In re Burlington Coat Factory Secs. Litig., 114

---

[11] Plaintiff maintains that he needs only to allege personal financial benefit, not wrongful intent. Again, case law states otherwise. As discussed above, the standard plaintiff mentions only applies to demand regarding particular financial transactions considered by the Board.

[12] As defendants note, the stock sold by Singh represented only 6% of the 5.6 million shares he held at the time. Defendants also point out that plaintiff erroneously alleges that Singh sold 600,000 shares during the "Relevant Period," when he actually sold only 300,000.

15

F.3d 1410, 1423 (3d. Cir. 1997).

The other allegations in the Complaint that attempt to justify futility also fail to state particular facts and thus run counter to Delaware law. First, the Complaint states in various forms that the directors whose conduct is in question would not sue themselves and therefore could not objectively assess demand.[13] As discussed above, this premise has been

---

In addition, defendants refute plaintiff's logic on the ground that he later alleges directors to be interested because they *retained* either shares or vested stock options and therefore would have been either motivated to inflate the price or concerned about losing their positions and their right to those options. This is inconsistent with plaintiff's argument regarding sales of stock. In addition, as a general proposition, it appears illogical to allege that one would fraudulently inflate the stock price and then not sell before the price fell.

Defendants also detail the timing of the sales, demonstrating that plaintiff has not shown that they were "suspicious" in that regard either. Specifically, plaintiff's allegations are further weakened by the revelation that a number of the sales upon which he relies were made before the first of the press releases that allegedly inflated the stock value. See supra note 7.

[13] The Complaint asserts numerous variations of the allegation that defendants are interested because for them to authorize a lawsuit on behalf of Primus would expose their own misconduct.

One variation is an allegation that to initiate such a suit would invite more class action securities fraud suits like the consolidated action in which Singh is a named defendant. As defendants note, if courts accepted this argument, a shareholder could always be assured of avoiding the demand requirement simply by including allegations of securities violations.

Another is an argument that defendants might lose their insurance coverage and thus be subject to personal liability if their conduct were exposed. However, Delaware courts reject this argument as merely a variation on the discredited notion that directors will never sue themselves. See Carauna v. Saligman, No. 11135, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990).

16

explicitly rejected by Delaware courts. Rather, to allege
sufficiently a "substantial likelihood of personal liability"
that would render defendants interested, the Complaint again
would need to articulate connections between specific
information to which each defendant had access and specific
false statements that each made, or caused to be made, to the
public. The Complaint does not come close to meeting this
requirement. As defendants argue, the Complaint does not
identify facts about particular meetings, documents or
witnesses to back up its sweeping allegations.[14] Plaintiff
tries to avoid this failure by arguing that the Complaint
states facts with particularity by citing the press releases.
This argument is unavailing because the Complaint fails to

---

Regarding insurance, defendants also note that any claims
implicating the duty of care, such as waste or gross
mismanagement, would fall under Primus's exculpation clause,
meaning that the directors would not be personally liable--and
therefore potentially interested--with regard to those issues.
See Malpiede v. Townson, 780 A.2d 1075, 1091-93 (Del. 2001).

[14] Defendants quote this Court's application of Rule 9(b)'s
analogous heightened pleading requirement:
   [A]t a minumum, for each alleged misstatement or
   omission, plaintiffs must plead specific facts
   concerning, for example, when each defendant or other
   corporate officer learned that a statement was false, how
   that defendant learned the statement was false, and the
   particular document or other source of information from
   which the defendant came to know that the statement was
   false . . . Group pleading fails to satisfy the
   requirement that the who, what, where, why, and when of
   the fraud be specified. Glaser v. Enzo Biochem, Inc.,
   303 F. Supp. 2d 727, 734 (E.D. Va. 2003)(internal
   citation omitted).

17

specify any statement of any defendant that contradicts the
information disseminated in the public releases.  Plaintiff
also argues that the heightened pleading standard does not
apply and that notice pleading is all that is required.[15]  This
argument fails as well, for as discussed above, the Delaware
courts have been very clear about the particularity with which
demand futility must be alleged.

Finally, the Complaint inadequately pleads that any
director, much less a majority of the Board, is either beholden
because of his position or dependent because of his personal
connections with an interested director.  Rather, the Complaint
generally asserts that the directors whose compensation or
position depend on the votes of other directors are
automatically beholden, which as noted above, is a conclusion
not recognized by the Delaware courts.  Similarly, the
allegations that directors are dependent because they worked at
the same organization years ago do not, without more, come
close to establishing entangling personal relationships under
the applicable standard.

For all of these reasons, the Court finds that the

---

[15] Plaintiff argues that his Complaint does not allege fraud
and that the cases defendant cites regarding particularized
pleading are inapplicable because they dealt with securities
fraud.  However, defendant points out that in the primary case on
point, McCall, the court was considering whether demand was
futile because of insider trading and applied the particularized
pleading standard.  See 239 F.3d at 816-17.

18

Complaint fails to allege with the requisite specificity that
demand was futile.  Accordingly, this Court lacks subject
matter jurisdiction to consider the Complaint, which therefore
must be dismissed.

## II.   Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6)

Defendants argue that even if the Complaint adequately
established that demand should be excused, it would have to be
dismissed for failure to state a claim under Fed. R. Civ. P.
12(b)(6).

### A.   Insider Trading, Unjust Enrichment and Breach of Fiduciary Duty Claims--Fed. R. Civ. P. 9(b)

With regard to the insider trading, breach of fiduciary
duty and unjust enrichment claims, Counts I, II and VI,
defendants argue that plaintiff failed to plead these claims
with the particularity required under Fed. R. Civ. P. 9(b).
Defendants argue that these claims "sound in fraud" and
therefore must be pled with the same details discussed above
concerning specific information that was communicated to named
directors via specific methods and that led directly to
specific improper stock sales.  See Frota v. Prudential-Bache
Secs., Inc., 639 F. Supp. 1186, 1192-93 (S.D.N.Y. 1986)("Rule
9(b) extends to all averments of fraud or mistake, whatever may
be the theory of legal duty--statutory, common law, tort,
contractual, or fiduciary.")  Plaintiff does not contest that

19

Rule 9(b) applies to all claims alleging fraud, but instead
puts forth a nonsensical, circular argument that he is only
alleging breach of fiduciary duty, not fraud, because he has
not set forth any facts regarding the details of defendants'
alleged knowledge and misuse of information.[16]  Plaintiff then
proceeds to detail how the Complaint alleges sufficient facts
under notice pleading.  However, because the Complaint alleges
fraud,[17] defendants have the better argument that these claims
are subject to Rule 9(b) and as explained above, are not
adequately pled with particularity.

B.   Corporate Waste

Defendants argue that the Complaint fails to state a claim
of corporate waste in that this Count only alleges that Primus
(1) wrongfully paid a bonus to defendant DePodesta, who acted

---

[16] Plaintiff does cite case law explaining that Rule 9(b)'s
requirements can be relaxed for breach of fiduciary duty claims
when relevant facts are known only to the defendant; however the
court in that case was expressly distinguishing such cases from
those in which plaintiffs alleged fraud.  See Concha v. London,
62 F.3d 1493, 1502 (9th Cir. 1995).

[17] Plaintiff himself characterizes his claims as alleging,
for example, that defendants (1) "conceal[ed] the fact that the
Company was improperly misrepresenting its financial prospects,"
(2) "artificially inflat[ed] the Company's stock price through
the dissemination of false and misleading statements pertaining
to Primus' financials" and (3) "deceiv[ed] the investing public
regarding management's operations, financial health and stability
and future business prospects."  See Pl.'s Opp. at 15.

unlawfully,[18] and (2) wrongfully paid attorneys fees for
defending Primus against the class action securities suits but
fails to allege facts sufficient to show that Primus received
no consideration for those expenditures.  See Sanders v. Wang,
No. 16640, 1999 WL 1044880, at *10 (Del. Ch. Nov. 10, 1999).
Specifically, defendants argue that plaintiff has not alleged
facts demonstrating that Primus received no consideration for
the services of the one officer/director to whom plaintiff
alleges it paid a bonus and that Primus clearly has received
valuable attorneys' services in return for the legal fees it
has paid.  Plaintiff responds briefly that the standard should
encompass instances in which the corporation receives
"consideration so disproportionately small as to lie beyond the
range at which any reasonable person might be willing to
trade."  Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch.
1997).  However, this minor distinction is irrelevant because
the bald assertion that any bonus paid to a director accused of
acting wrongfully must be almost worthless is too speculative
and vague to state a claim under either standard.  Moreover,
given the early stage of the pending class action securities
litigation, it is premature to allege that Primus has not

---

[18] As defendants note, the Complaint only recites defendant
DePodesta's total compensation of $1,064,750, which included
salary, bonus and "other compensation."  The Complaint does not
allege what portion of that amount comprised DePodesta's bonus.

21

received value from those attorneys' fees.

     C.   Exculpation Clause

    Defendants also argue that Primus's corporate charter exculpates the directors from all of plaintiff's claims that constitute duty of care violations.[19]  Delaware courts recognize such clauses as grounds for dismissal of derivative suits.  See Malpiede, 780 A.2d at 1093.  Plaintiff counters that his claims are premised not on negligence, but rather on bad faith, and that bad faith allegations cannot be determined on a motion to dismiss because they are questions of fact ripe for discovery.  See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P., 624 A.2d 1199, 1208 (Del. 1993).  Essentially plaintiff argues that his claims constitute allegations of violations of the duty of loyalty and not the duty of care.  Defendants respond by maintaining that if the claims are alleged to be duty of loyalty violations based on defendants' intentional misconduct and concealing of information, then they "sound in fraud" and must be pled with particularity.  Defendants acknowledge that there is some "middle ground," which covers duty of loyalty claims that do not allege fraud and thus would neither be extinguished by an exculpation clause

---

[19] These claims are gross mismanagement and waste, Counts IV and V, as well as breach of fiduciary duty and abuse of control, Counts II and III, to the extent that the latter two are not premised on intentional action.

nor be subject to the heightened pleading requirements.  During

oral argument, plaintiff claimed that he is pleading this

middle ground.  However, plaintiff's efforts to recharacterize

his claims in this manner is inconsistent with the allegations

in the Complaint, which clearly read as claims of fraud, rather

than as either non-fraudulent violations of the duty of loyalty

or breaches of the duty of care.

To the extent that plaintiff's claims read in fraud, they

must be dismissed for lack of particularity; and to the extent

that they read in negligence, they must be dismissed in light

of Primus's exculpation clause.  Plaintiff's attempts to

recharacterize his claims as being in the "middle ground" are

inconsistent with the allegations in the Complaint.

III. Premature and Speculative Claim of Damages

Defendants' final argument is that the damages of which

plaintiff complains are premature and speculative.  First, they

challenge any damages that are based on harm Primus might incur

from the pending federal securities fraud class actions.

Second, they argue that plaintiff's assertion of lost market

capitalization from a "liar's discount" to Primus's stock

cannot substantiate a claim for present injury.[20]  The case law

defendants cite for these propositions is persuasive.  See,

---

[20] The Complaint explains the "liar's discount" as a
hesitancy on the part of investors to purchase stock in a
corporation after learning that false information about the
corporation was previously disseminated to the investing public.

e.g., Daisy Sys. Corp. v. Finegold, No, C86-20719, 1988 WL
166235, at *4 (N.D. Cal. Sept. 19, 1988)(dismissing derivative
case in which damages claim was based merely on the filing of
another lawsuit); In re Symbol Techs. Secs. Litig., 762 F.
Supp. 510, 517 (E.D.N.Y. 1991)(holding that to allege harm to
market credibility a plaintiff must specify facts
substantiating the corporation's lessened ability to attract
financing or related damages). Plaintiff attempts to
distinguish these cases on the facts but primarily relies on
his allegation that Primus has suffered damages in the amount
of the $27 million in stock shares sold by defendants and $1.04
billion in lost market capitalization.[21]   However, defendants
again have the better arguments. First, plaintiff cannot
support a claim for damages based on insider trading
allegations that it has failed to plead sufficiently. Second,
plaintiff has not pled any specific facts tying fluctuations in
market capitalization to defendants' allegedly wrongful
actions.[22]  Plaintiff's vague allegations of loss of reputation
are similarly insufficient.

---

[21] As defendants point out in their Reply, plaintiff appears
to concede that the case law supports defendants' argument that
damages from the securities fraud class actions are premature.

[22] Defendants also mention that the Court may take judicial
notice of the rise in Primus's stock price to nearly the level at
which it was trading before the disclosure of the "true facts"
that plaintiff alleges caused the price to drop. This fact,
defendants argue, rebuts any allegation of "irreparable harm."

24

IV.   Oral Motion for Leave to Amend

At oral argument, plaintiff requested that if the Court
dismissed the Complaint, he be granted leave to file an Amended
Complaint.  However, the Court finds that plaintiff already has
had more than adequate notice of and time to correct the
deficiencies in the Complaint.  Defendants filed the Motion to
Dismiss on November 1, 2004, more than one month before it was
noticed for argument.  Plaintiff, however, chose to oppose
defendants' Motion rather than seeking leave to amend the
Complaint to bolster its allegations.  In addition, plaintiff
appears not to have availed himself of opportunities to gather
more information regarding defendants' actions.  For example,
as discussed in Rales, a case upon which plaintiff heavily
relies, Delaware law allows "a stockholder who has met the
procedural requirements and has shown a specific proper purpose
[to] use the summary procedure embodied in 8 Del. C. § 220 to
investigate the possibility of corporate wrongdoing."  634 A.2d
at 935 n.10.  The Delaware Supreme Court specifically referred
to that provision, in addition to the public records that
detail many corporate acts, as a means through which plaintiffs
can meet the particularization requirement for demonstrating
the futility of demand.  Id.  Given plaintiff's failure to take
advantage of the resources at his disposal and the considerable
time during which he had notice of the potential inadequacy of
the Complaint but failed to request leave to amend, plaintiff's

25

oral Motion for Leave to Amend the Complaint will be denied.

### Conclusion

For the reasons stated in open court, as amplified by this Memorandum Opinion, defendants' Motion to Dismiss will be granted, and plaintiff's oral Motion for Leave to Amend the Complaint will be denied. An appropriate Order will issue.

The Clerk is directed to forward copies of this Memorandum Opinion and the accompanying Order to counsel of record.

Entered this 8th day of December, 2004.

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

26